## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In Re: | : Bankruptcy No. 1:15-bk-04164-HWV |
| John Daniel Wolfe and Carol Denise Wolfe | : Chapter 13 |
| Debtor | : |
| | : |
| The Bank of New York Mellon as Trustee for | : |
| CWABS, Inc. Asset-Backed Certificates, | : |
| Series 2005-17 c/o Select Portfolio Servicing, | : |
| Inc. | : |
| Movant | : |
| vs. | : |
| John Daniel Wolfe and Carol Denise Wolfe | : |
| Debtor/Respondent | : |
| and | : |
| Charles J DeHart, III, Esquire | : |
| Trustee/Respondent | : |

## MOTION FOR RELIEF FROM AUTOMATIC STAY, UNDER 11 U.S.C. § 362

Movant, by its Attorneys, Hladik, Onorato & Federman, LLP, hereby requests a Termination of the Automatic Stay and leave to proceed with its State Court rights provided under the terms of the Mortgage.

1. Movant is The Bank of New York Mellon as Trustee for CWABS, Inc. Asset-Backed Certificates, Series 2005-17 c/o Select Portfolio Servicing, Inc. ("Movant").

2. Debtors, John Daniel Wolfe and Carol Denise Wolfe ("Debtors") are the owners of the premises located at 6 Valley Run Circle, Hanover, PA 17331 (the "property").

3. Charles J DeHart, III, Esquire is the Trustee appointed by the Court.

4. Debtors filed a Petition for Relief under Chapter 13 of the Bankruptcy Code on September 28, 2015.

5. Movant is the holder of a mortgage lien on the Property in the original principal amount of $212,000.00, which was recorded on December 07, 2005 (the "Mortgage"). A true and correct copy of the Mortgage is attached hereto as Exhibit "A."

6. The Mortgage was assigned to Movant by way of a written assignment of mortgage, which was recorded on October 24, 2008. A true and correct copy of the assignment of mortgage is attached hereto as Exhibit "B."

7. As of 06/27/2018 the unpaid principal balance is $212,189.26.

8. As of 06/27/2018, Movant has not received the monthly post-petition Mortgage payments from July 01, 2016 through February 01, 2017 in the amount of $1,284.40 each, plus payments from March 01, 2017 through January 01, 2018 in the amount of $1,327.03 each, plus payments from February 01, 2018 through June 01, 2018 in the amount of $1,371.72 each, less suspense in the amount of $5.60, for a total post-petition arrearage of $31,725.53.

9. The entity that has the right to foreclose is The Bank of New York Mellon as Trustee for CWABS, Inc. Asset-Backed Certificates, Series 2005-17 by virtue of being owner and holder of note.

10. Movant has cause to have the Automatic Stay terminated, in order to permit Movant to complete foreclosure on its Mortgage.

11. This Motion and the averments contained herein do not constitute a waiver by the Movant of its right to seek reimbursement of any amounts not included in this Motion, including fees and costs, due under the terms of the Mortgage and applicable law.

**WHEREFORE,** Movant respectfully requests that this Court enter an Order:

a. Modifying the Automatic Stay under 11 U.S.C. § 362 of the Bankruptcy Code with respect to the Property as to permit Movant to foreclose on its Mortgage and allow Movant or any other purchaser at Sheriff's Sale to take legal or consensual action for enforcement of its right to possession of, or title to; and

b. Granting any other relief that this Court deems equitable and just.

Respectfully Submitted,

Date: 08/17/2018

/s/Danielle Boyle-Ebersole, Esquire
Danielle Boyle-Ebersole, Esquire
Hladik, Onorato & Federman, LLP
Attorney I.D. # 81747
298 Wissahickon Avenue
North Wales, PA 19454
Phone 215-855-9521
Fax 215-855-9121

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In Re: | : Bankruptcy No. 1:15-bk-04164-HWV |
| John Daniel Wolfe and Carol Denise Wolfe | : Chapter 13 |
| Debtor | : |
| | : |
| The Bank of New York Mellon as Trustee for | : |
| CWABS, Inc. Asset-Backed Certificates, | : |
| Series 2005-17 c/o Select Portfolio Servicing, | : |
| Inc. | : |
| Movant | : |
| vs. | : |
| John Daniel Wolfe and Carol Denise Wolfe | : |
| Debtor/Respondent | : |
| and | : |
| Charles J DeHart, III, Esquire | : |
| Trustee/Respondent | : |

## **ORDER**

AND NOW, this _____ day of _____, 2018, upon the Motion of Movant, The Bank of New York Mellon as Trustee for CWABS, Inc. Asset-Backed Certificates, Series 2005-17 c/o Select Portfolio Servicing, Inc., it is:

ORDERED AND DECREED THAT: the Motion is granted, and the Automatic Stay of all proceedings, as provided under 11 U.S.C. § 362 of the Bankruptcy Code is modified with respect to the premises, 6 Valley Run Circle, Hanover, PA 17331 as more fully set forth in the legal description attached to said mortgage, to allow Movant or its successors, if any, to exercise its rights under its loan documents.

_____
Honorable Henry W. Van Eck
U.S. Bankruptcy Judge

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In Re: | : Bankruptcy No. 1:15-bk-04164-HWV |
| John Daniel Wolfe and Carol Denise Wolfe | : Chapter 13 |
| Debtor | : |
| | : |
| The Bank of New York Mellon as Trustee for | : |
| CWABS, Inc. Asset-Backed Certificates, | : |
| Series 2005-17 c/o Select Portfolio Servicing, | : |
| Inc. | : |
| Movant | : |
| vs. | : |
| John Daniel Wolfe and Carol Denise Wolfe | : |
| Debtor/Respondent | : |
| and | : |
| Charles J DeHart, III, Esquire | : |
| Trustee/Respondent | : |

## CERTIFICATION OF SERVICE OF MOTION, RESPONSE DEADLINE AND HEARING DATE

I, Danielle Boyle-Ebersole, attorney for Movant, The Bank of New York Mellon as Trustee for CWABS, Inc. Asset-Backed Certificates, Series 2005-17 c/o Select Portfolio Servicing, Inc., hereby certify that I served a true and correct copy of the Motion for Relief from Automatic Stay and Notice of Motion, Response Deadline and Hearing Date, by United States Mail, first class, postage prepaid, or Electronic Mail on **08/17/2018** upon the following:

Larry W. Wolf
Via ECF
*Attorney for Debtor*

Charles J DeHart, III, Esquire
Via ECF
*Trustee*

John Daniel Wolfe
6 Valley Run Circle
Hanover, PA 17331
Via First Class Mail
*Debtor*

Carol Denise Wolfe
6 Valley Run Circle
Hanover, PA 17331
Via First Class Mail
*Debtor*

Dated: 08/17/2018

/s/Danielle Boyle-Ebersole, Esquire
Danielle Boyle-Ebersole, Esquire
Hladik, Onorato & Federman, LLP
Attorney I.D. # 81747
298 Wissahickon Avenue
North Wales, PA 19454
Phone 215-855-9521
Fax 215-855-9121

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In Re: | : Bankruptcy No. 1:15-bk-04164-HWV |
| John Daniel Wolfe and Carol Denise Wolfe | : Chapter 13 |
| Debtor | : |
| | : |
| The Bank of New York Mellon as Trustee for | : |
| CWABS, Inc. Asset-Backed Certificates, | : |
| Series 2005-17 c/o Select Portfolio Servicing, | : |
| Inc. | : |
| Movant | : |
| vs. | : |
| John Daniel Wolfe and Carol Denise Wolfe | : |
| Debtor/Respondent | : |
| and | : |
| Charles J DeHart, III, Esquire | : |
| Trustee/Respondent | : |

## <u>NOTICE OF MOTION, RESPONSE</u>
## <u>DEADLINE AND HEARING DATE</u>

The Bank of New York Mellon as Trustee for CWABS, Inc. Asset-Backed Certificates, Series 2005-17 c/o Select Portfolio Servicing, Inc. has filed with the US Bankruptcy Court a Motion for Relief from Stay regarding its rights it has under the mortgage or with respect to the property located at: 6 Valley Run Circle, Hanover, PA 17331.

**<u>Your rights may be affected</u>. You should read these papers carefully and discuss them with your attorney, if you have one in this bankruptcy case. (If you do not have an attorney, you may wish to consult with an attorney.)**

1.      If you do not want the Court to grant the relief sought in the motion or if you want the court to consider your views on the motion, then on or before **<u>08/31/2018</u>,** you or your attorney must do <u>all</u> of the following things:

(a) **FILE AN ANSWER** explaining your position at:

Clerk, United States Bankruptcy Court
Ronald Reagan Federal Building
228 Walnut Street
7th Floor, Suite 730
Harrisburg, PA 17101

If you mail your answer to the Bankruptcy Court Clerk's Office for filing, you must mail is early enough so that it will be received on or before the date stated above; **and**

(b) **MAIL A COPY** of the documents to the Movant's attorney:

Danielle Boyle-Ebersole, Esq.
Hladik, Onorato & Federman, LLP
298 Wissahickon Avenue
North Wales, PA  19454
Phone 215-855-9521
Fax 215-855-9121
Email: debersole@hoflawgroup.com

2.      If you or your attorney do not take these steps described in paragraphs 1(a) and 1(b) above and attend the hearing, the court may enter an order granting the relief requested in the motion.

3.      A **HEARING ON THE MOTION** is scheduled to be held before the Hon. Judge Henry W. Van Eck on **09/18/2018** at **09:30am** in the **Third Floor Courtroom**, of the Ronald Reagan Federal Building, 228 Walnut Street, Harrisburg, PA 171017.

4.      If a copy of the Motion is not enclosed, a copy of the motion will be provided to you if you request a copy from the attorney named in paragraph 1(b).

5.      You may contact the Bankruptcy Court Clerk's office at (215) 408-2845 to find out whether the hearing has been canceled because no one filed an answer.

DATE:  08/17/2018

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In Re: | : Bankruptcy No. 1:15-bk-04164-HWV |
| John Daniel Wolfe and Carol Denise Wolfe | : Chapter 13 |
| Debtor | : |
| | : |
| The Bank of New York Mellon as Trustee for | : |
| CWABS, Inc. Asset-Backed Certificates, | : |
| Series 2005-17 c/o Select Portfolio Servicing, | : |
| Inc. | : |
| Movant | : |
| vs. | : |
| John Daniel Wolfe and Carol Denise Wolfe | : |
| Debtor/Respondent | : |
| and | : |
| Charles J DeHart, III, Esquire | : |
| Trustee/Respondent | : |

## CERTIFICATION OF NON-CONCURRENCE

I, Danielle Boyle-Ebersole, Esquire counsel for The Bank of New York Mellon as Trustee for CWABS, Inc. Asset-Backed Certificates, Series 2005-17 c/o Select Portfolio Servicing, Inc., Creditor, hereby certify that on **August 07, 2018**, our office contacted Debtors' counsel, Larry W. Wolf, Esquire. To date we have not received concurrence, therefore, Creditor files this Motion with a Non-Concurrence.

/s/Danielle Boyle-Ebersole, Esquire
Danielle Boyle-Ebersole, Esquire
Hladik, Onorato & Federman, LLP
Attorney I.D. # 81747
298 Wissahickon Avenue
North Wales, PA 19454
Phone 215-855-9521
Fax 215-855-9121

## LOCAL BANKRUPTCY FORM 4001-1

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

IN RE:

John Daniel Wolfe and Carol Denise Wolfe       :       **CHAPTER 13**

                                                 :       **CASE NO.** 1 - 15 -bk- 04164-HWV

                     **Debtor(s)**       :

### POST-PETITION PAYMENT HISTORY
### NOTE AND MORTGAGE DATED 11/22/2005

Recorded on 12/07/2005 , in     YORK     **County**, in **Book** 1776 , at **Page** 1223 .

Property Address:

6 Valley Run Circle, Hanover, PA 17331

Mortgage Servicer:

Select Portfolio Servicing, Inc.

Post-petition mailing address for Debtor(s) to send payment:

Attn: Remittance Processing, P.O. Box 65450, Salt Lake City, UT 84165-0450

Mortgagor(s)/Debtor(s):

John Daniel Wolfe and Carol Denise Wolfe

Payments are contractually due:

Monthly ✓   Semi-monthly ☐   Bi-weekly ☐   Other ☐

Each Monthly Payment is comprised of:

| | |
|---|---|
| Principal and Interest....... | $825.98 |
| R.E. Taxes..................... | |
| Insurance...................... | |
| Late Charge.................. | |
| Other........................... | $545.74 (Specify: ESCROW ) |
| **TOTAL**....................... | $1371.72 |

**POST-PETITION PAYMENTS** (Petition was filed on 09/28/2015 )

| Payment amount due | Date payment was due | Date payment was received | Amount received | Check number | How payment was applied (mo./yr.) |
|---|---|---|---|---|---|
| N/A | SEE | ATTACHED | POST | PAYMENT | HISTORY |
| N/A | N/A | N/A | N/A | N/A | N/A |
| N/A | N/A | N/A | N/A | N/A | N/A |
| N/A | N/A | N/A | N/A | N/A | N/A |
| N/A | N/A | N/A | N/A | N/A | N/A |
| N/A | N/A | N/A | N/A | N/A | N/A |
| N/A | N/A | N/A | N/A | N/A | N/A |
| N/A | N/A | N/A | N/A | N/A | N/A |
| N/A | N/A | N/A | N/A | N/A | N/A. |
| N/A | N/A | N/A | N/A | N/A | N/A |
| N/A | N/A | N/A | N/A | N/A | N/A |
| N/A | N/A | N/A | N/A | N/A | N/A |

[Continue on attached sheets if necessary]

TOTAL NUMBER OF POST-PETITION PAYMENTS PAST DUE:     24     as of   06/27/2018  .

TOTAL AMOUNT OF POST-PETITION ARREARS:     $31,725.53   as of   06/27/2018  .

Dated:     8/13/2018

**Select Portfolio Servicing, Inc.**

Mortgage Company

K.B.H.

Kenneth B. Hampton          Document Control Officer

(Print Name and Title)

(2)

| **Pmt Hist Chapter 13s** | | | | | | |
|---|---|---|---|---|---|---|
| **Name:** | WOLFE | **Case #** | 1:15-bk-04164-HWV | **Chapter:** | | 13 |
| **Loan Number :** | XXXXXX9080 | **File date:** | 09/28/15 | | | |
| | | | | | | |
| **Post Pet Due Date** | **Post Pet Due Amt** | **Date Paid** | **Amt Paid** | **U/A D** | **Total U/A D** | **Comments** |
| Starting Balance | | | | | | |
| 2/1/2016 | $1,284.40 | 3/31/2016 | $1,284.40 | | | |
| 3/1/2016 | $1,284.40 | 4/1/2016 | $1,284.40 | | | |
| 4/1/2016 | $1,284.40 | 5/23/2016 | $1,284.40 | | | |
| 5/1/2016 | $1,284.40 | 9/30/2016 | $1,284.40 | | | |
| 6/1/2016 | $1,284.40 | 1/27/2017 | $1,290.00 | $5.60 | $5.60 | |
| 7/1/2016 | $1,284.40 | DUE | | | $5.60 | |
| 8/1/2016 | $1,284.40 | DUE | | | $5.60 | |
| 9/1/2016 | $1,284.40 | DUE | | | $5.60 | |
| 10/1/2016 | $1,284.40 | DUE | | | $5.60 | |
| 11/1/2016 | $1,284.40 | DUE | | | $5.60 | |
| 12/1/2016 | $1,284.40 | DUE | | | $5.60 | |
| 1/1/2017 | $1,284.40 | DUE | | | $5.60 | |
| 2/1/2017 | $1,284.40 | DUE | | | $5.60 | |
| 3/1/2017 | $1,327.03 | DUE | | | $5.60 | |
| 4/1/2017 | $1,327.03 | DUE | | | $5.60 | |
| 5/1/2017 | $1,327.03 | DUE | | | $5.60 | |
| 6/1/2017 | $1,327.03 | DUE | | | $5.60 | |
| 7/1/2017 | $1,327.03 | DUE | | | $5.60 | |
| 8/1/2017 | $1,327.03 | DUE | | | $5.60 | |
| 9/1/2017 | $1,327.03 | DUE | | | $5.60 | |
| 10/1/2017 | $1,327.03 | DUE | | | $5.60 | |
| 11/1/2017 | $1,327.03 | DUE | | | $5.60 | |
| 12/1/2017 | $1,327.03 | DUE | | | $5.60 | |
| 1/1/2018 | $1,327.03 | DUE | | | $5.60 | |
| 2/1/2018 | $1,371.72 | DUE | | | $5.60 | |
| 3/1/2018 | $1,371.72 | DUE | | | $5.60 | |
| 4/1/2018 | $1,371.72 | DUE | | | $5.60 | |
| 5/1/2018 | $1,371.72 | DUE | | | $5.60 | |
| 6/1/2018 | $1,371.72 | DUE | | | $5.60 | |
| | | | | | $5.60 | |
| | | | | | $5.60 | |

# EXHIBIT A

Prepared By:
DORIS GOMEZ
COUNTRYWIDE HOME LOANS, INC.


1330 WEST SOUTHERN AVENUE
TEMPE
AZ 85282

Phone: (480)437-5000

After Recording Return To:

Service Link ██████████
4000 Industrial Boulevard
Aliquippa, PA 15001
1-800-439-5451

Parcel Number:
████████

Premises:
6 VALLEY RUN CIR
HANOVER
PA 17331-9269

———————————— [Space Above This Line For Recording Data] ————————————

[Escrow/Closing #]        [Doc ID #]

# MORTGAGE

MI ████████████████

PENNSYLVANIA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS
Page 1 of 17

Initials ██████

-6A(PA) (0502)    CHL (02/05)(d)    VMP Mortgage Solutions, Inc. (800)521-7291        Form 3039  1/01

Book 1776 Page 1223

DOC ID ███████████████

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated  NOVEMBER 22, 2005 ,
together with all Riders to this document.

**(B) "Borrower"** is
JOHN D WOLFE , AND CAROL D. WOLFE, AS TENANTS BY THE ENTIRETIES

Borrower is the mortgagor under this Security Instrument.

**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(D) "Lender"** is
COUNTRYWIDE HOME LOANS, INC.

Lender is a
CORPORATION

organized and existing under the laws of NEW YORK
Lender's address is
4500 Park Granada
Calabasas, CA 91302-1613

**(E) "Note"** means the promissory note signed by Borrower and dated  NOVEMBER 22, 2005 .
The Note states that Borrower owes Lender
TWO HUNDRED TWELVE THOUSAND and 00/100

Dollars (U.S. $ 212,000.00      ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than  DECEMBER 01, 2035 .

**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

Initials ⟨signature⟩

**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

- ☐ Adjustable Rate Rider ☐ Condominium Rider ☐ Second Home Rider
- ☐ Balloon Rider ☐ Planned Unit Development Rider ☐ 1-4 Family Rider
- ☐ VA Rider ☐ Biweekly Payment Rider ☐ Other(s) [specify]

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to

Initials: _J.W. Qoew_

DOC ID # ███████████████

MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the

      COUNTY         of               YORK

      [Type of Recording Jurisdiction]        [Name of Recording Jurisdiction]

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

which currently has the address of

      6 VALLEY RUN CIR, HANOVER
              [Street/City]

Pennsylvania 17331-9269 ("Property Address"):
    [Zip Code]

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

Initials: _Jul Cou_

**VMP** -6A(PA) (0502)    CHL (02/05)        Page 4 of 17               Form 3039 1/01

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or an encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums

for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on

DOC ID # ███████████████

the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

Initials: _W C Q_

DOC ID # ███████████

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Initials: _____

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan

is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or

repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of

Initials: _____

VMP -6A(PA) (0602)     CHL (02/06)          Page 11 of 17                    Form 3039 1/01

Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by

Initials: ___

⬤ -6A(PA) (0502)    CHL (02/05)    Page 12 of 17    Form 3039  1/01

this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency,

Initials: _____

-6A(PA) (0502)    CHL (02/05)    Page 13 of 17    Form 3039 1/01

instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

VMP -6A(PA) (0502)    CHL (02/05)    Page 14 of 17    Initials ~~~~~    Form 3039 1/01

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). Lender shall notify Borrower of, among other things: (a) the default; (b) the action required to cure the default; (c) when the default must be cured; and (d) that failure to cure the default as specified may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. Lender shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured as specified, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees and costs of title evidence to the extent permitted by Applicable Law.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, this Security Instrument and the estate conveyed shall terminate and become void. After such occurrence, Lender shall discharge and satisfy this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waivers.** Borrower, to the extent permitted by Applicable Law, waives and releases any error or defects in proceedings to enforce this Security Instrument, and hereby waives the benefit of any present or future laws providing for stay of execution, extension of time, exemption from attachment, levy and sale, and homestead exemption.

**25. Reinstatement Period.** Borrower's time to reinstate provided in Section 19 shall extend to one hour prior to the commencement of bidding at a sheriff's sale or other sale pursuant to this Security Instrument.

**26. Purchase Money Mortgage.** If any of the debt secured by this Security Instrument is lent to Borrower to acquire title to the Property, this Security Instrument shall be a purchase money mortgage.

**27. Interest Rate After Judgment.** Borrower agrees that the interest rate payable after a judgment is entered on the Note or in an action of mortgage foreclosure shall be the rate payable from time to time under the Note.

DOC ID ██████████

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_Helone M Keeper_

_Helone M Keeper_

_John D Wolfe_ _____ (Seal)
JOHN D. WOLFE                                         -Borrower

_Carol D Wolfe_ _____ (Seal)
CAROL D. WOLFE                                       -Borrower

_____ (Seal)
                                                     -Borrower

_____ (Seal)
                                                     -Borrower

VMP -6A(PA) (0502)      CHL (02/05)          Page 16 of 17                    Form 3039  1/01

DOC I [redacted]

**COMMONWEALTH OF PENNSYLVANIA,** York                                County ss:

On this, the ___22nd___ day of ___November___, ___2005___, before me, the undersigned officer, personally appeared ___John D. Wolfe___ ___and___ ___Carol D. Wolfe___ known to me (or satisfactorily proven) to be the person(s) whose name(s) ~~is~~/are subscribed to the within instrument and acknowledged that ~~he/she~~/they executed the same for the purposes herein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

My Commission Expires: 1-9-08

_Kylene M. Leeper_

_Notary Public_

Title of Officer

> COMMONWEALTH OF PENNSYLVANIA
> Notarial Seal
> Kylene M. Leeper, Notary Public
> Greene Twp., Franklin County
> My Commission Expires Jan. 9, 2008
> Member, Pennsylvania Association Of Notaries

**Certificate of Residence**

I, ___Lisa Snyder___, do hereby certify that the correct address of the within-named Mortgagee is P.O. Box 2026, Flint, MI 48501-2026.

Witness my hand this ___28th___ day of ___November, 2005___.

_Lisa Snyder_

Agent of Mortgagee

Initials: _LW COW_

VMP -6A(PA) (0502)     CHL (02/05)          Page 17 of 17                    Form 3039  1/01

All that certain parcel of land situate in the County of York, Commonwealth of Pennsylvania being known and designated as follows:

Lot No. 135 on subdivision plan of Little Knoll Estates, Section 2, prepared by Group Hanover, dated April 28, 1989, designated as Project No. 872060, which said subdivision plan is recorded in the Office of the Recorder of Deeds of York County, Pennsylvania in Plan Book JJ, Page 433.

Tax/Parcel ID: ███████

Penn Twp

*YORK COUNTY RECORDER OF DEEDS*
*100 WEST MARKET STREET*
*YORK, PA 17401*

*Randi L. Reisinger - Recorder*
*Gloria A. Fleming - Deputy*

**Instrument Number -** ▮▮▮▮▮▮
Recorded On 12/7/2005 At 3:46:40 PM
**\* Instrument Type - MORTGAGE**
**Invoice Number -** ▮▮▮▮▮
**\* Grantor - WOLFE, JOHN D**
**\* Grantee - MORTGAGE ELECTRONIC REGISTRATION SYSTEMS INC**
**User - DEF**
**\* Customer - PREMIER**

**Book - 1776   Starting Page - 1223**
**\* Total Pages - 19**

**\* FEES**

| | |
|---|---|
| STATE WRIT TAX | $0.50 |
| JCS/ACCESS TO JUSTICE | $10.00 |
| RECORDING FEES | $41.00 |
| AFFORDABLE HOUSING | $11.50 |
| PIN NUMBER FEES | $2.00 |
| COUNTY ARCHIVES FEE | $2.00 |
| ROD ARCHIVES FEE | $3.00 |
| TOTAL | $70.00 |

**PARCEL IDENTIFICATION NUMBER**
▮▮▮▮▮▮▮▮▮▮▮

Total Parcels: 1

I Certify This Document To Be
Recorded In York County, Pa.



Recorder of Deeds

*THIS IS A CERTIFICATION PAGE*
## *PLEASE DO NOT DETACH*
*THIS PAGE IS NOW PART OF THIS LEGAL DOCUMENT*

\* - Information denoted by an asterisk may change during the verification process and may not be reflected on this page.

Book: **1776**  Page: **1241**

**Home Affordable Modification Agreement**
**(Servicer Copy)**

**Bank of America** Home Loans

Investor Loan #

**After Recording Return To:**
Bank of America, N.A.
C/O Home Retention Services, Inc.
9700 Bissonnet Street
Suite 1500
Houston, TX 77036

This document was prepared by
Home Retention Services, Inc.
Modifications Department
9700 Bissonnet Street
Suite 1500
Houston, TX 77036
877.422.1761

_____ **[Space Above This Line For Recording Data]** _____

# HOME AFFORDABLE MODIFICATION AGREEMENT

Borrower ("I"):[1] JOHN D WOLFE

Original Lender/Beneficiary Lender or Servicer ("Lender"): Bank of America, N.A.
Date of first lien mortgage, deed of trust, or security deed ("Mortgage") and Note ("Note"):
November 22, 2005
Loan Number: █████████████
Property Address: (See Exhibit A for Legal Description if applicable) "Property":
6 Valley Run Cir, Hanover, PA 17331
See Exhibit B for assignments of record if applicable.

If my representations and covenants in Section 1 continue to be true in all material respects, then this Home Affordable Modification Agreement ("Agreement") will, as set forth in Section 3, amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage. The Mortgage and Note together, as they may previously have been amended, are referred to as the "Loan Documents." Capitalized terms used in this Agreement and not defined have the meaning given to them in Loan Documents.

I understand that after I sign and return two copies of this Agreement to the Lender, the Lender will send me a signed copy of this Agreement. This Agreement will not take effect unless the preconditions set forth in Section 2 have been satisfied.

**1.** **My Representations and Covenants. I certify, represent to Lender, covenant and agree:**

[1] If more than one Borrower or Mortgagor is executing this document, each is referred to as "I". For purposes of this document words signifying the singular (such as "I") shall include the plural (such as "we") and vice versa where appropriate.

A. I am experiencing a financial hardship, and as a result, (i) I am in default under the Loan Documents or my default is imminent, and (ii) I do not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments now or in the near future;

B. Either I have not been displaced and one of the borrowers signing this Agreement lives in the Property as a principal residence or lived in the Property as a principal residence immediately prior to being displaced; or I am currently displaced and (i) I intend to re-occupy the Property as a principal residence in the future, (ii) I do not own any single-family real estate other than the subject Property, and (iii) the Property has not been condemned.

C. There has been no impermissible change in the ownership of the Property since I signed the Loan Documents. A permissible change would be any transfer that the lender is required by law to allow, such as a transfer to add or remove a family member, spouse or domestic partner of the undersigned in the event of a death, divorce or marriage;

D. I have provided documentation for all income that I receive (and I understand that I am not required to disclose child support or alimony unless I chose to rely on such income when requesting to qualify for the Home Affordable Modification Program ("Program"));

E. Under penalty of perjury, all documents and information I have provided to Lender in connection with this Agreement, including the documents and information regarding my eligibility for the Program, are true and correct;

F. If Lender requires me to obtain credit counseling in connection with the Program, I will do so; and

G. I have made or will make all payments required under a trial period plan.

H. I was discharged in a Chapter 7 Bankruptcy proceeding subsequent to the execution of the Loan Documents. Based on this representation, Lender agrees that I will not have personal liability on the debt pursuant to this Agreement.

2. **Acknowledgements and Preconditions to Modification.** I understand and acknowledge that:

A. If prior to the Modification Effective Date as set forth in Section 3 the Lender determines that any of my representations in Section 1 are no longer true and correct or any covenant in Section 1 has not been performed, the Loan Documents will not be modified and this Agreement will terminate. In that event, the Lender will have all of the rights and remedies provided by the Loan Documents; and

**B.** I understand that the Loan Documents will not be modified unless and until (i) the Lender accepts this Agreement by signing and returning a copy of it to me, and (ii) the Modification Effective Date (as defined in Section 3) has occurred. I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Agreement.

3.    **The Modification.** If my representations and covenants in Section 1 continue to be true in all material respects and all preconditions to the modification set forth in Section 2 have been met, the Loan Documents will automatically become modified on February 01, 2016 (the "Modification Effective Date") and all unpaid late charges that remain unpaid will be waived. I understand that if I have failed to make any payments as a precondition to this modification under a trial period plan, this modification will not take effect. The first modified payment will be due on February 01, 2016.

    **A.** The Maturity Date will be: December 01, 2035.

    **B.** The modified principal balance of my Note will include all amounts and arrearages that will be past due as of the Modification Effective Date (including unpaid and deferred interest, fees, escrow advances and other costs, but excluding unpaid late charges, collectively, "Unpaid Amounts") less any amounts paid to the Lender but not previously credited to my Loan. The new principal balance of my Note will be $213,215.73 (the "New Principal Balance"). I understand that by agreeing to add the Unpaid Amounts to the outstanding principal balance, the added Unpaid Amounts accrue interest based on the interest rate in effect under this Agreement. I also understand that this means interest will now accrue on the unpaid interest that is added to the outstanding principal balance, which would not happen without this Agreement. Any fees or charges incurred in connection with the servicing of your loan which were not invoiced before we calculated the Unpaid Amounts will appear on your monthly statement under "Fees and Charges." These amounts may be paid when billed or at any time afterward. They will not accrue interest or late fees. If they remain unpaid, they must be satisfied at the earlier of: (i) the date you sell or transfer an interest in the Property, (ii) the date you pay the entire New Principal Balance, or (iii) the Maturity Date.

    **C.** Interest at the rate of 3.500% will begin to accrue on the New Principal Balance as of January 01, 2016 and the first new monthly payment on the New Principal Balance will be due on February 01, 2016. My payment schedule for the modified Loan is as follows:

| Years | Interest Rate | Interest Rate Change Date | Monthly Principal and Interest Payment Amount | Estimated Monthly Escrow Payment Amount* | Total Monthly Payment* | Payment Begins On | Number of Monthly Payments |
|---|---|---|---|---|---|---|---|
| Years 1-20 | 3.500% | January 01, 2016 | $825.98 | $458.42 May adjust periodically | $1,284 40 May adjust periodically | February 01, 2016 | 239 |

*The escrow payments may be adjusted periodically in accordance with applicable law and therefore my total monthly payment may change accordingly.

The above terms in this Section 3.C. shall supersede any provisions to the contrary in the Loan Documents, including but not limited to, provisions for an adjustable, step or simple interest rate.

I understand that, if I have a pay option adjustable rate mortgage loan, upon modification, the minimum monthly payment option, the interest-only or any other payment options will no longer be offered and that the monthly payments described in the above payment schedule for my modified Loan will be the minimum payment that will be due each month for the remaining term of the Loan. My modified Loan will not have a negative amortization feature that would allow me to pay less than the interest due resulting in any unpaid interest being added to the outstanding principal balance.

AMORTIZATION EXTENSION I understand that my monthly principal and interest payment for the New Principal Balance reflects amortization of principal over 40 years from the date of my first modification payment. The scheduled maturity date of my loan will remain unchanged. If I make all of the scheduled payments under the modification on time, a principal remaining balance of $142,829.63 will remain unpaid on the scheduled maturity date. This balance will accrue interest at the Note rate and is called a balloon payment; I will need to make arrangements to pay this remaining balance when I pay off my loan or transfer an interest in or refinance or sell my home. This balloon payment may decrease if I am eligible for earned forgiveness.

THIS LOAN IS PAYABLE IN FULL AT MATURITY. YOU MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THE LOAN AND UNPAID INTEREST THEN DUE. THE LENDER

IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME. YOU WILL, THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT YOU MAY OWN, OR YOU WILL HAVE TO FIND A LENDER, WHICH MAY BE THE LENDER YOU HAVE THIS LOAN WITH, WILLING TO LEND YOU THE MONEY. IF YOU REFINANCE THIS LOAN AT MATURITY, YOU MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN EVEN IF YOU OBTAIN REFINANCING FROM THE SAME LENDER.

**D.** I will be in default if I do not comply with the terms of the Loan Documents, as modified by this Agreement.

**E.** If a default rate of interest is permitted under the Loan Documents, then in the event of default under the Loan Documents, as amended, the interest that will be due will be the rate set forth in Section 3.C.

**F.** I agree to pay in full the Deferred Principal Balance and any other amounts still owed under the Loan Documents by the earliest of: (i) the date I sell or transfer an interest in the Property, (ii) the date I pay the entire Interest Bearing Principal Balance, or (iii) the Maturity Date.

4.   **Additional Agreements.** I agree to the following:

**A.** That all persons who signed the Loan Documents or their authorized representative(s) have signed this Agreement, unless (i) a borrower or co-borrower is deceased; (ii) the borrower and co-borrower are divorced and the property has been transferred to one spouse in the divorce decree, the spouse who no longer has an interest in the property need not sign this Agreement (although the non-signing spouse may continue to be held liable for the obligation under the Loan Documents); or (iii) the Lender has waived this requirement in writing.

**B.** That this Agreement shall supersede the terms of any modification, forbearance, trial period plan or other workout plan that I previously entered into with Lender.

**C.** To comply, except to the extent that they are modified by this Agreement, with all covenants, agreements, and requirements of Loan Documents including my agreement to make all payments of taxes, insurance premiums, assessments, Escrow Items, impounds, and all other payments, the amount of which may change periodically over the term of my Loan.

**D.** Funds for Escrow Items. I will pay to Lender on the day payments are due under the Loan
·    Documents as amended by this Agreement, until the Loan is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which

can attain priority over the Mortgage as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under the Loan Documents; (d) mortgage insurance premiums, if any, or any sums payable to Lender in lieu of the payment of mortgage insurance premiums in accordance with the Loan Documents; and (e) any community association dues, fees, and assessments that Lender requires to be escrowed. These items are called "Escrow Items." I shall promptly furnish to Lender all notices of amounts to be paid under this Section 4.D. I shall pay Lender the Funds for Escrow Items unless Lender waives my obligation to pay the Funds for any or all Escrow Items. Lender may waive my obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, I shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. My obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in the Loan Documents, as the phrase "covenant and agreement" is used in the Loan Documents. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Lender may exercise its rights under the Loan Documents and this Agreement and pay such amount and I shall then be obligated to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with the Loan Documents, and, upon such revocation, I shall pay to Lender all Funds, and in such amounts, that are then required under this Section 4.D. Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under the Real Estate Settlement Procedures Act ("RESPA"), and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge me for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays me interest on the Funds and applicable law permits Lender to make such a charge. Unless an agreement is made in writing or applicable law requires interest to be paid on the Funds, Lender shall not be required to pay me any interest or earnings on the Funds. Lender and I can agree in writing, however, that interest shall be paid on the Funds. Lender shall provide me, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to me for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify me as required by RESPA, and I shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify me as required by RESPA, and I shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by the Loan Documents, Lender shall promptly refund to me any Funds held by Lender.

E. That the Loan Documents as modified by this Agreement are duly valid, binding agreements, enforceable in accordance with their terms and are hereby reaffirmed.

F. That all terms and provisions of the Loan Documents, except as expressly modified by this Agreement, remain in full force and effect; nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents; and that except as otherwise specifically provided in, and as expressly modified by, this Agreement, the Lender and I will be bound by, and will comply with, all of the terms and conditions of the Loan Documents.

G. That, as of the Modification Effective Date, notwithstanding any other provision of the Loan Documents, if all or any part of the Property or any interest in it is sold or transferred without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Mortgage. Lender shall not exercise this option if state or federal law, rules or regulations prohibit the exercise of such option as of the date of such sale or transfer. If Lender exercises this option, Lender shall give me notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which I must pay all sums secured by the Mortgage. If I fail to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Mortgage without further notice or demand on me.

H. That, as of the Modification Effective Date, I understand that the Lender will only allow the transfer and assumption of the Loan, including this Agreement, to a transferee of my property as permitted under the Garn St. Germain Act, 12 U.S.C. Section 1701j-3. A buyer or transferee of the Property will not be permitted, under any other circumstance, to assume the Loan. Except as noted herein, this Agreement may not be assigned to, or assumed by, a buyer or transferee of the Property.

I. That, as of the Modification Effective Date, if any provision in the Note or in any addendum or amendment to the Note allowed for the assessment of a penalty for full or partial prepayment of the Note, such provision is null and void.

J. That, I will cooperate fully with Lender in obtaining any title endorsement(s), or similar title insurance product(s), and/or subordination agreement(s) that are necessary or required by the Lender's procedures to ensure that the modified mortgage Loan is in first lien position and/or is fully enforceable upon modification and that if, under any circumstance and not withstanding anything else to the contrary in this Agreement, the Lender does not receive such title endorsement(s), title insurance product(s) and/or subordination agreement(s), then the terms of this Agreement will not become effective on the Modification Effective Date and the Agreement will be null and void. I also agree to allow Lender to attach an Exhibit A to this loan modification which will include a Legal Description, recording information of the original security instrument, and any other relevant information required by a County Clerk's Office to allow for recording if and when recording becomes necessary for Lender.

K. That I will execute such other documents as may be reasonably necessary to either (i) consummate the terms and conditions of this Agreement; or (ii) correct the terms and conditions of this Agreement if an error is detected after execution of this Agreement. I understand that either a corrected Agreement or a letter agreement containing the correction will be provided to me for my signature. At Lender's option, this Agreement will be void and of no legal effect upon notice of such error. If I elect not to sign any such corrective documentation, the terms of the original Loan Documents shall continue in full force and effect, such terms will not be modified by this Agreement, and I will not be eligible for a modification under the Home Affordable Modification Program.

L. That Lender will collect and record personal information, including, but not limited to, my name, address, telephone number, social security number, credit score, income, payment history, government monitoring information, and information about account balances and activity. In addition, I understand and consent to the disclosure of my personal information and the terms of the trial period plan and this Agreement by Lender to (i) the U.S. Department of the Treasury, (ii) Fannie Mae and Freddie Mac in connection with their responsibilities under the Home Affordability and Stability Plan; (iii) any investor, insurer, guarantor or servicer that owns, insures, guarantees or services my first lien or subordinate lien (if applicable) mortgage loan(s); (iv) companies that perform support services for the Home Affordable Modification Program and the Second Lien Modification Program; and (v) any HUD certified housing counselor.

M. That if any document related to the Loan Documents and/or this Agreement is lost, misplaced,

misstated, inaccurately reflects the true and correct terms and conditions of the Loan as modified, or is otherwise missing, I will comply with the Lender's request to execute, acknowledge, initial and deliver to the Lender any documentation the Lender deems necessary. If the Note is replaced, the Lender hereby indemnifies me against any loss associated with a demand on the Note. All documents the Lender requests of me under this Section 4.N. shall be referred to as "Documents." I agree to deliver the Documents within ten (10) days after I receive the Lender's written request for such replacement.

N. If my Loan Documents govern a home equity loan or line of credit, then I agree that as of the Modification Effective Date, I am terminating my right to borrow new funds under my home equity loan or line of credit. This means that I cannot obtain additional advances, and must make payments according to this Agreement. (Lender may have previously terminated or suspended my right to obtain additional advances under my home equity loan or line of credit, and if so, I confirm and acknowledge that no additional advances may be obtained.)

O. OPTIONAL PRODUCTS PURCHASED AFTER CLOSING I understand and agree that any optional product(s) I may have purchased after the closing of my Loan, the cost for which I agreed to have added to my Total Monthly Payment: (a) will remain in force so long as I add the amount due and owing to my Total Monthly Payment each month; and (b) will continue to be governed by the terms of the documents the provider of the optional product delivered to me ("Governing Documents"), unless (i) I notify the provider of the optional product of my request to cancel; or (ii) I fail to pay any and all amounts payable when due, at which time the optional product may terminate as provided under the terms of the Governing Documents. I understand that if I have questions regarding any optional product(s) I may have purchased, I should contact Bank of America, N.A. by calling 800.641 5298.

In Witness Whereof, the Lender and I have executed this Agreement.
(Signatures must be signed exactly as printed, original signature required, no photocopies accepted)

SIGN
HERE      _____       1-26-16
             Borrower John D Wolfe                      Date

**DO NOT WRITE BELOW THIS LINE**

THIS SECTION IS FOR INTERNAL USE ONLY

**Bank of America, N.A., for itself or as successor by merger to BAC Home Loans Servicing, LP**

By: Stewart Lender Services, Inc., its attorney in fact

By:_____          _____
                                                                                              Date
_____, Stewart Lender Services, Inc.

**Modification Agreement**
(Servicer Copy)

**Bank of America** 🎯 Home Loans

RECORDING REQUESTED BY:
Bank of America, N.A.
Attn Home Retention Division: █████████
400 NATIONAL WAY
Simi Valley, CA 93065

Loan ████████████████

(Page 1 of 11)

**This document was prepared by**
Home Retention Services, Inc.,
Modifications Department
9700 Bissonnet Street
Suite 1500
Houston, TX 77036
1.877.422.1761

_____ *SPACE ABOVE THIS LINE FOR RECORDER'S USE* _____

## LOAN MODIFICATION AGREEMENT

This Loan Modification Agreement ("Agreement"), effective on the date set forth below, between JOHN D WOLFE, (the "Borrower(s)") and Bank of America, N.A. ("Lender"), amends and supplements (1) the Mortgage, Deed of Trust, or Deed to Secure Debt (the "Security Instrument"), dated the 22 day of November, 2005 and in the amount of $212,000.00, and (2) the Note bearing the same date as, and secured by, the Security Instrument which covers the real and personal property described in the Security Instrument and defined therein as in the "Property", located at 6 Valley Run Cir, Hanover, PA 17331. (See Exhibit A for Legal Description if applicable) "Property"

See Exhibit B for assignments of record if applicable

If my representations in Section 1 below continue to be true in all material respects, then this Modification Agreement ("Agreement") will, as set forth in Section 3 below, amend and supplement (1) the Mortgage or Deed of Trust ("Mortgage") on the Property and (2) the Note secured by the Mortgage, and any previous modifications to the Mortgage and/or Note. The Mortgage and Note together, as they may previously have been amended, are referred to as the "Loan Documents". Capitalized terms used in this Agreement and not defined here have the meaning given to them in the Loan Documents.

I have received three copies of this Agreement. After I sign and return two copies of this Agreement to Lender, I will retain the other copy for my records. This Agreement will not take effect unless the preconditions set forth in Section 2 below have been satisfied.

1.  **My Representations and Covenants**. I certify, represent to Lender, covenant and agree:

    I am experiencing a financial hardship, and as a result, (1) I am in default under the Loan Documents or my default is imminent, and (2) I do not have sufficient income or access to

(Page 2 of 11)

sufficient liquid assets to make the monthly mortgage payments now or in the near future.

A.    There has been no impermissible change in the ownership of the Property since I signed the Loan Documents. A permissible change would be any transfer that the lender is required by law to allow.

B.    I have provided documentation for all income that I receive and I understand that I am not required to disclose child support or alimony unless I chose to rely on such income when requesting to qualify for this Loan Modification ("Modification").

C.    Under penalty of perjury, all documents and information that I (or any third party on my behalf) have provided to Lender in connection with this Agreement, including the documents and information regarding my eligibility for the Program, are true and correct.

D.    I have made all payments required under a trial period plan or loan workout plan.

E.    I received a discharge in a Bankruptcy proceeding after the execution of the Loan Documents. Based on this representation, Lender agrees that I will not have personal liability on the debt pursuant to this Agreement.

2.    **Acknowledgements and Preconditions to Modification.** I understand and acknowledge that:

A.    If prior to the Modification Effective Date as set forth in Section 3 below, Lender determines that any of my representations in Section 1 above are no longer true and correct, or any covenant in Section 1 has not been performed, the Loan Documents will not be modified and this Agreement will terminate. In that event, Lender will have all of the rights and remedies provided by the Loan Documents; and

B.    I understand that the Loan Documents will not be modified unless and until (1) I return signed and notarized copies of this Agreement to Lender, (2) the Lender accepts this Modification by signing it, and (3) the Modification Effective Date (as defined in Section 3 below) has occurred. I further understand and agree that Lender will not be obligated to modify the Loan Documents if I fail to meet any of the requirements under this Agreement.

3.    **The Modification.** If all of my representations in Section 1 continue to be true in all material respects and all preconditions to the modification set forth in Section 2 above have been met, the Loan Documents will automatically become modified on April 01, 2015 (the "Modification Effective Date"). I understand that if I have failed to make any payments as a precondition to this

modification under a trial period plan or loan workout plan, this modification will not take effect. The Maturity Date will be: December 01, 2035.

A.    The modified principal balance of my Note will include all amounts and arrearages that will be past due as of the Modification Effective Date (including unpaid and deferred interest, fees, charges, escrow advances, and other costs, but excluding unpaid late charges, collectively, ("Unpaid Amounts") less any amounts paid to Lender but not previously credited to my Loan. The new principal balance of my Note will be $209,474.73 (the "New Principal Balance"). Any fees or charges incurred in connection with the servicing of your loan which were not invoiced before we calculated the Unpaid Amounts will appear on your monthly statement under "Fees and Charges." These amounts may be paid when billed or at any time afterward. They will not accrue interest or late fees. If they remain unpaid, they must be satisfied at the earlier of: (i) the date you sell or transfer an interest in the Property, (ii) the date you pay the entire New Principal Balance, or (iii) the Maturity Date. I understand that by agreeing to add the Unpaid Amounts to the outstanding principal balance, the added Unpaid Amounts accrue interest based on the interest rate in effect under this Agreement. I also understand that this means that interest will now accrue on the unpaid interest that is added to the outstanding principal balance, which would not happen without this Agreement.

B.    Interest at the rate of 2.000% will begin to accrue on the New Principal Balance as of March 01, 2015 and the first new monthly payment on the New Principal Balance will be due on April 01, 2015. My payment schedule for the modified Loan is as follows:

| Years | Interest Rate | Interest Rate Change Date | Monthly Principal and Interest Payment Amount | Estimated Monthly Escrow Payment Amount* | Total Monthly Payment* | Payment Begins On | Number of Monthly Payments |
|-------|---------------|---------------------------|-----------------------------------------------|-------------------------------------------|------------------------|-------------------|----------------------------|
| Years 1-3 | 2.000% | 03/01/2015 | $1,028.56 | $470.23 May adjust periodically | $1,498.79 May adjust periodically | 04/01/2015 | 36 |
| Year 4 | 3.000% | 03/01/2018 | $1,116.97 | May adjust periodically | May adjust periodically | 04/01/2018 | 12 |
| Years 5-21 | 3.750% | 03/01/2019 | $1,182.59 | May adjust periodically | May adjust periodically | 04/01/2019 | 201 |

* If escrow payments are collected by Lender, Lender may adjust such payments periodically in accordance with applicable law. Therefore, my total monthly payment may change accordingly.

The terms in this Section 3.B. supersede any provisions to the contrary in the Loan Documents, and previous loan modifications including (but not limited to) provisions for an adjustable or interest-only rate.

C.   I will be in default if I do not comply with the terms of the Loan Documents, as modified by this Agreement.

4.   **Additional Agreements.** Lender and I agree to the following:

A.   All persons, or their authorized representative(s), who signed the Loan Documents have signed this Agreement, unless (1) a borrower or co-borrower is deceased; (2) the borrower and co-borrower are divorced and the property has been transferred to one spouse in the divorce decree, meaning that the spouse who no longer has an interest in the property need not sign this Agreement (although the non-signing spouse may continue to be held liable for the obligation under the Loan Documents); or (3) Lender has waived this requirement in writing.

B.   This Agreement supersedes the terms of any modification, forbearance, trial period plan, or loan workout plan that I previously entered into with Lender.

(Page 5 of 11)

C.    I will comply, except to the extent that they are modified by this Agreement, with all covenants, agreements, and requirements of the Loan Documents, including my agreement to make all payments of taxes, insurance premiums, assessments, Escrow Items, impounds, and all other payments, the amount of which may periodically change over the term of my Loan.

D.    The Loan Documents are composed of duly valid, binding agreements, enforceable in accordance with their terms and are hereby reaffirmed.

E.    All terms and provisions of the Loan Documents, except as expressly modified by this Agreement, remain in full force and effect. Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents. Except as otherwise specifically provided in, and as expressly modified by, this Agreement, Lender and I will be bound by, and will comply with, all of the terms and conditions of the Loan Documents.

F.    I will pay to Lender on the day payments are due under the Loan Documents as amended by this Agreement, until the Loan is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over the Mortgage as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under the Loan Documents; (d) mortgage insurance premiums, if any, or any sums payable to Lender in lieu of the payment of mortgage insurance premiums in accordance with the Loan Documents; and (e) any community association dues, fees, and assessments that Lender requires to be escrowed. These items are called "Escrow Items". I shall promptly furnish to Lender all notices of amounts to be paid under this Section 4.F. I shall pay Lender the Funds for Escrow Items unless Lender waives my obligation to pay the Funds for any or all Escrow Items. Lender may waive my obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, I shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. My obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in the Loan Documents, as the phrase "covenant and agreement" is used in the Loan Documents. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Lender

(Page 6 of 11)



may exercise its rights under the Loan Documents and this Agreement and pay such amount and I shall then be obligated to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with the Loan Documents, and, upon such revocation, I shall pay to Lender all Funds, and in such amounts, that are then required under this Section 4.F.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under the Real Estate Settlement Procedures Act ("RESPA"), and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

G.    On and after the Modification Effective Date, and notwithstanding any other provision of the Loan Documents, if all or any part of the Property or any interest in it is sold or transferred without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Mortgage. However, Lender shall not exercise this option if state or federal law, rules, or regulations prohibit the exercise of such option as of the date of such sale or transfer. If Lender exercises this option, Lender shall give me notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which I must pay all sums secured by the Mortgage. If I fail to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Mortgage without further notice or demand.

H.    On and after the Modification Effective Date, Lender will allow the transfer and assumption of the Loan, including this Agreement, only to a transferee of my property as permitted under the Garn-St Germain Act, 12 U.S.C. Section 1701j-3. A buyer or transferee of the Property will not be permitted, under any other circumstance, to assume the Loan. Except as noted herein, this Agreement may not be assigned to, or assumed by, a buyer or transferee of the Property.

I.    On and after the Modification Effective Date, any provision in the Note (or in any addendum or amendment to the Note) that allowed for the assessment of a penalty for full or partial prepayment of the Note, is null and void.

J.    I will cooperate fully with Lender in obtaining any title endorsement(s), or similar title insurance product(s), and/or subordination agreement(s) that are necessary or required

(Page 7 of 11)

by Lender's procedures to ensure that the modified mortgage loan is in first-lien position and/or is fully enforceable upon modification. Under any circumstance and not withstanding anything else to the contrary in this Agreement, if Lender does not receive such title endorsement(s), title insurance product(s), and/or subordination agreement(s), the terms of this Agreement will not become effective on the Modification Effective Date and the Agreement will be null and void. I will allow Lender to attach an Exhibit to this Loan Modification that will include a Legal Description, recording information of the original security instrument, and any other relevant information required by a County Clerk's Office to allow for recording if and when recording becomes necessary for Lender.

K.     I will execute such other documents as may be reasonably necessary either to (1) consummate the terms and conditions of this Agreement; or (2) correct the terms and conditions of this Agreement if an error is detected after execution of this Agreement. A corrected Agreement will be provided to me and this Agreement will be void and of no legal effect upon notice of such error. If I elect not to sign such corrected Agreement, the terms of the original Loan Documents, or the most recent modified terms currently in effect, shall continue in full force, and the terms of the original Loan Documents, or the most recent modified terms currently in effect, will not be modified by this Agreement.

L.     OPTIONAL PRODUCTS PURCHASED AFTER CLOSING. Any optional product(s) I may have purchased after the closing of my Loan, the cost for which I agreed to have added to my Total Monthly Payment, will (1) remain in force as long as I add the amount due and owing to my Total Monthly Payment each month and (2) continue to be governed by the terms of the documents the provider of the optional product delivered to me ("Governing Documents"), unless I (a) notify the provider of the optional product of my request to cancel; or (b) fail to pay any and all amounts payable when due, at which time the optional product may terminate as provided under the Governing Documents. If I have questions about any optional product(s) I may have purchased, I should call Bank of America at 1.800.641.5298.

M.     If any document related to the Loan Documents and/or this Agreement is lost, misplaced, misstated, inaccurately reflects the true and correct terms and conditions of the loan as modified, or is otherwise missing, I will comply with Lender's request to execute, acknowledge, initial and deliver to Lender any documentation Lender deems necessary. If the original promissory note is replaced, Lender hereby indemnifies me against any loss associated with a demand on the original note. All documents that Lender requests of me under this shall be referred to as the "Documents". I will deliver the Documents

(Page 8 of 11)

within ten (10) days after I receive Lender's written request for such replacement.

N.    If the principal balance of my loan increased as a result of this modification, the mortgage insurance premiums, if any, on my loan may increase. If my mortgage insurance premium increases, my monthly mortgage payment will be higher. Furthermore, the date on which I may request cancellation of mortgage insurance may change as a result of the higher unpaid principal balance.

In Witness Whereof, the Lender and I have executed this Agreement.
(Signatures must be signed exactly as printed, original signature required, no photocopies accepted)

_Jl D Wolfe_                                             (Seal)   3 - 16 - 15
Borrower  John D Wolfe                                            Date

_____[Space Below This Line For Acknowledgement]_____

Commonwealth of PENNSYLVANIA
County of _____York_____

On this, the _16th_ day of _March_____ in the year 20 _15_, before me, _Michael K Wagner_ (notary
name), the undersigned officer, personally appeared _John D Wolfe_____

_____(borrower name(s)), known to me (or satisfactorily proven) to be the person
whose name(s) (is/are) subscribed to the within instrument and acknowledged that (he/she/they) executed the same
                    circle one                                                                                    circle one
for the purposes therein contained.

In witness whereof I hereunto set my hand and official seal.

My commission expires: ____10/26/2017

Commonwealth of Pennsylvania                    _Signature of Notarial Officer_
NOTARIAL SEAL                                     Signature of Notarial Officer
Michael K Wagner, Notary Public
Hanover Borough, York County                    _Notary_
My Commission Expires October 26, 2017           Title of Officer

**DO NOT WRITE BELOW THIS LINE**

THIS SECTION IS FOR INTERNAL USE ONLY

**Bank of America, N.A., for itself or as successor by merger to BAC Home Loans Servicing, LP**

By: Stewart Lender Services, Inc., its attorney in fact

By: _____     _____

_____, Stewart Lender Services, Inc.     Date

STATE OF TEXAS

COUNTY OF HARRIS

On _____ before me _____ Notary Public-Stewart Lender Services, Inc., personally appeared _____ Stewart Lender Services, Inc. personally known to me to be the person whose name is subscribed to the within instrument and acknowledgment that he/she executed the same in his/her authorization capacity, and that by his/her signature on the instrument the person, or entity upon behalf of which the person acted, executed the instrument.

Witness my hand and official seal.

Signature _____

_____

My commission expires: _____

(Page 11 of 11)

# **EXHIBIT B**

Prepared By and Return To: Beth Gladel
GOLDBECK McCAFFERTY & McKEEVER
Mellon Independence Center - Suite 5000
701 Market Street
Philadelphia, PA 19106-1532
215-627-1322

GMM File Number ███████

Parcel ID# ███████

# ASSIGNMENT OF MORTGAGE

**MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., ACTING SOLELY AS A NOMINEE FOR COUNTRYWIDE HOME LOANS, INC.** (Assignor), for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt of which is acknowledged, does grant, bargain, sell, assign and transfer to **BANK OF NEW YORK AS TRUSTEE FOR THE CERTIFICATEHOLDERS CWABS, INC. ASSET-BACKED CERTIFICATES, SERIES 2005-17.**

**BANK OF NEW YORK AS TRUSTEE FOR THE CERTIFICATEHOLDERS CWABS, INC. ASSET-BACKED CERTIFICATES, SERIES 2005-17** (Assignee), all of its right, title and interest, as holder of, in, and to the following described mortgage, the property described and the indebtedness secured by the mortgage:

Executed **CAROL D. WOLFE and JOHN D. WOLFE** , Mortgagor(s); to **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., ACTING SOLELY AS A NOMINEE FOR COUNTRYWIDE HOME LOANS, INC.** Bearing date of: **November 22, 2005**; Amount Secured: **$212,000.00**; Recorded on **December 07, 2005**; in Book **1776**, Page **1223 Instrument # 2005095869**; in the Recorder of Deeds Office of **York** County, Commonwealth of Pennsylvania ("Mortgage")

Property: **6 Valley Run Circle, Hanover,PA 17331**

*Penn Twp*
AS FURTHER DESCRIBED IN EXHIBIT "A". ATTACHED AND INCORPORATED INTO THIS ASSIGNMENT.

Together with the note or obligation described in the Mortgage endorsed to the Assignee,("Note") and all moneys due and to become due on the Note and Mortgage, with interest. Assignee its successors, legal representatives and assigns shall hold all rights under the Note and Mortgage forever, subject however, to the right and equity of redemption, if any, of the maker(s) of the Mortgage, their heirs and assigns forever.

Assignor, by its appropriate corporate officers. has executed and sealed with its corporate seal this Assignment of Mortgage on this 𝕏 𝕏 day of Oct 3 , 2008.



MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, INC., ACTING
SOLELY AS A NOMINEE FOR
COUNTRYWIDE HOME LOANS, INC.

(Affix Corporate Seal)

_____ (SEAL)
Name: Carrie Ehinger, 1st Vice President
Title:

_____ (SEAL)
Name: David Perez, Asst. Vice President
Title:

ss:
STATE OF _____**TEXAS**_____ )

COUNTY OF _____**COLLIN**_____ )

BE IT REMEMBERED, that on this ____ day of ___OCT  3 2008___, 2008, before me, the subscriber, a
Notary Public personally appeared **Carrie Ehinger, 1st Vice President**
**David Perez, Asst. Vice President** MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, INC., ACTING SOLELY AS A NOMINEE FOR
COUNTRYWIDE HOME LOANS, INC.
officers of Assignor, who I am satisfied are the persons who signed the within instrument and they
acknowledged that they signed, sealed with the corporate seal and delivered the same as such officers
aforesaid, and that the within instrument is the voluntary act and deed of such corporation made by virtue
of a Resolution of its Board of Directors.

_____
Notary Public
My commission expires:

I hereby certify the address of the Assignee is:
**7105 Corporate Drive, PTX B-35, Plano, TX  75024-3632**

## EXHIBIT A

All that certain parcel of land situate in the County of York, Commonwealth of Pennsylvania being known and designated as follows:

Lot No. 135 on subdivision plan of Little Knoll Estates, Section 2, prepared by Group Hanover, dated April 28, 1989, designated as Project No. 872060, which said subdivision plan is recorded in the Office of the Recorder of Deeds of York County, Pennsylvania in Plan Book JJ, Page 433.

*YORK COUNTY RECORDER OF DEEDS*
*28 EAST MARKET STREET*
*YORK, PA 17401*

*Randi L. Reisinger - Recorder*
*Gloria A. Fleming - Deputy*



Instrument Number - ███████
Recorded On 10/24/2008 At 10:27:57 AM
* Instrument Type - ASSIGNMENT OF MORTGAGE
Invoice Number - ████
* Grantor - WOLFE, JOHN D
* Grantee - BANK OF NEW YORK
User - DS
* Customer - GOLDBECK MCCAFFERTY MCKEEVER

Book - 1991   Starting Page - 246
* Total Pages - 4

* Received By:  MAIL

PARCEL IDENTIFICATION NUMBER

███████████████

Total Parcels: 1

| * FEES | |
|---|---|
| STATE WRIT TAX | $0.50 |
| JCS/ACCESS TO JUSTICE | $10.00 |
| RECORDING FEES | $13.50 |
| PIN NUMBER FEES | $2.00 |
| COUNTY ARCHIVES FEE | $2.00 |
| ROD ARCHIVES FEE | $3.00 |
| TOTAL PAID | $31.00 |

I Certify This Document To Be
Recorded In York County, Pa.

Recorder of Deeds

*THIS IS A CERTIFICATION PAGE*
## PLEASE DO NOT DETACH
*THIS PAGE IS NOW PART OF THIS LEGAL DOCUMENT*

* - Information denoted by an asterisk may change during the verification process and may not be reflected on this page.

Book: 1991   Page: 249

# INTEREST ONLY FIXED RATE NOTE

| NOVEMBER 22, 2005 | HANOVER | ORIGINAL | PENNSYLVANIA |
|---|---|---|---|
| [Date] | [City] | | [State] |

6 VALLEY RUN CIR, HANOVER, PA 17331-9269
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 212,000.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is
COUNTRYWIDE HOME LOANS, INC.
I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 7.250 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will make a payment every month. This payment will be for interest only for the first 60 months, and then will consist of principal and interest.

I will make my monthly payment on the FIRST day of each month beginning on
JANUARY 01, 2006 . I will make these payments every month until I have paid all of the Principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest it will be applied to interest before Principal. If, on
DECEMBER 01, 2035 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at
P.O. Box 660694, Dallas, TX 75266-0694
or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ 1,280.83 for the first 60 months of this Note, and thereafter will be in the amount of U.S. $ 1,532.35 . The Note Holder will notify me prior to the date of change in monthly payment.

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A prepayment of all of the unpaid principal is known as a "Full Prepayment." A prepayment of only part of the unpaid principal is known as a "Partial Prepayment."

If the original Principal amount of this loan is $50,000 or less, I may make a Full or Partial Prepayment without paying any penalty. However, if the original Principal amount of this Note exceeds $50,000,

☐ I may prepay this Note in full at any time without penalty.

☒ If within the first SIXTY months after the execution of the Note, I make any prepayment(s) within any 12-month period, the total of which exceeds 20 percent (20%) of the original principal amount of this loan, I will pay a prepayment penalty in an amount equal to the payment of six (6) months' advance interest on the amount by which the total of my prepayment(s) within that 12-month period exceeds 20 percent (20%) of the original principal amount of the loan.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a Partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of    FIFTEEN    calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    5.000 % of my overdue payment of interest, during the period when my payment is interest only, and of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10. APPLICABLE LAW

I agree that this agreement is to be governed by federal law and, to the extent not preempted by federal law, by the laws of the state where the real property is located. If a law, which applies to this loan and sets maximum loan charges is finally interpreted so that the interest and other charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such interest or other charge shall be reduced by the amount necessary to reduce the interest or other charge to the permitted limit; and (b) any sums already collected from me which exceed permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a Partial Prepayment, but in no event will a prepayment charge be assessed if the Note Holder chooses to reduce my Principal balance by applying such excess amounts.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

$\sqrt{w}$

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
JOHN D. WOLEY                    -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

*(Sign Original Only)*

PAY TO THE ORDER OF

WITHOUT RECOURSE
COUNTRYWIDE HOME LOANS, INC.

BY _____
David A. Spector
Managing Director

● BC - Interest Only Fixed Rate Note
2E111-PA (02/04)